FILED
2005 Jun-23  PM 02:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT HICKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-03-S-2858-NE** |
| | ) | |
| **JACKSON COUNTY** | ) | |
| **COMMISSION, _et al.,_** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff Robert Hicks filed this action under 42 U.S.C. § 1983, seeking redress for alleged violations of his Fourteenth Amendment rights to procedural due process and equal protection of the laws.[1]  He named as defendants his employer,  the Jackson County, Alabama, Commission ("the Commission"), and the individual members of the Commission:  Robert E. Smith; Ed Tubbs; and Glenda Hodges.  Each individual defendant was sued both in his or her respective individual capacity, and in his or her official capacity as a County Commissioner.[2]  All defendants filed a collective motion to dismiss plaintiff's complaint[3] and, because the motion was accompanied by matters outside the pleadings, the court converted the motion to one for summary judgment.[4]

---

[1]_See_ doc. no. 1 (Complaint).

[2]_See id._

[3]Doc. no. 6.

[4]Doc. no. 7.  Federal Rule of Civil Procedure 12 states:

Upon consideration of the motion, briefs,[5] and evidentiary submissions,[6] the court finds the motion is due to be granted.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment not only is proper, but "*shall be* rendered *forthwith* if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In making this determination, the court must review all evidence and

---

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

[5]Doc. no. 9 (Defendant's Brief in Support of Motion to Dismiss/Alternative Motion for Summary Judgment); doc. no. 10 (Plaintiff's Brief in Opposition to Motion to Dismiss); Defendant's Reply Brief (appended to doc. no. 11).

[6]Doc. no. 1 (Verified Complaint); attachments to doc. no. 6 (Motion to Dismiss).

make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v.*

*Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*).

## II.  FACTUAL BACKGROUND

The following facts either are not disputed, or are stated in the light most favorable to plaintiff.[7]

Plaintiff was employed by the Public Works Department (sometimes referred to as "the Department") of the Jackson County Commission from approximately March of 2002, to April of 2003.[8]  He was not a probationary employee and, thus, his employment could only be terminated for just cause.[9]  He commenced his

---

[7]The facts are derived primarily from plaintiff's verified complaint. Plaintiff did not file an affidavit in opposition to defendants' motion; instead, he states that, because his "complaint was notarized it should be treated as an affidavit." Doc. no. 10 (plaintiff's brief in opposition to defendant's motion to dismiss), at 1. The court will treat it as such.

[8]*See* Complaint, at ¶¶ 8, 20. Plaintiff does not state the exact date he commenced his employment with the Commission. From plaintiff's submissions, the court can ascertain that he was employed by the Commission by March of 2002, at the latest. *See* Complaint, at ¶¶ 20-22.

[9]*Id.* at ¶ 3.

employment in the position of "general laborer," but at the time of the incidents made the basis of this lawsuit he served in the position of "Highway Maintenance Technician 1st Class."[10]   His duties included working on crews to repair roads maintained by Jackson County and, on occasion, repairing the driveways of county residents.[11]

The Public Works Department possesses the authority to pave or repair the driveways of county residents, as long as the repairs do not extend beyond the county's right of way.[12]   The Department does not possess the authority to pave or repair any driveway located within the limits of a municipality in Jackson County.[13] Even so, plaintiff states that the Department does not always operate within its limitations.  According to plaintiff, the Department often repairs private driveways beyond the edge of the county's right of way, and it also repairs the driveways of county employees who live within the limits of a municipality.[14]

Plaintiff does not live within the limits of a municipality,[15] and on at least three occasions he has used county materials and/or labor to repair his own driveway.

---

[10]*Id.* at ¶ 9.

[11]*Id.* at ¶ 10.

[12]*Id.* at ¶¶ 11-12.

[13]*Id.* at ¶ 13.

[14]*Id.* at ¶¶ 15-18.

[15]*Id.* at ¶ 19.

First, in approximately March of 2002, plaintiff requested that the Public Works Department repair portions of his driveway that had been washed away by rain.[16] Plaintiff's supervisor approved the request, and a crew from the Public Works Department repaired plaintiff's driveway.[17]  Plaintiff was not a member of that crew.[18]

The following week, portions of plaintiff's driveway were again washed away by rain.[19]  Plaintiff requested that the Public Works Department repair the driveway, and his supervisor approved the request.[20]  In April of 2002, a crew from the Public Works Department made additional repairs to plaintiff's driveway.[21]  Plaintiff *was* a member of that crew.[22]

Finally, in February of 2003, portions of plaintiff's driveway were, for yet a third time, washed away by rain.[23]  Plaintiff and other members of his work crew used county materials to repair the driveway while they were working near plaintiff's home.[24]  There is no indication that plaintiff obtained the approval of his supervisor, or any other Public Works Department official, prior to making this repair.

---

[16]*Id.* at ¶¶ 20-21.

[17]*Id.* at ¶ 22.

[18]*Id.* at ¶ 23.

[19]*Id.* at ¶ 24.

[20]*Id.* at ¶¶ 25-27.

[21]*Id.* at ¶ 28.

[22]*Id.* at ¶ 29.

[23]*Id.* at ¶ 31.

[24]*Id.* at ¶¶ 31-32.

This series of events eventually led to the institution of disciplinary proceedings against plaintiff.  In early February of 2003, the Commission received an anonymous letter that plaintiff "had misappropriated County Public Works monies and labor by having his driveway paved beyond the County's right of way."[25]  On February 20, 2003, plaintiff received notice that a disciplinary hearing, which could lead to his termination, would be held on March 6, 2003.[26]  At the hearing, plaintiff's supervisors testified that they had approved certain of the repairs to his driveway,[27] but they nevertheless recommended that he be "suspended for two weeks without pay and be required to reimburse the county for the work and materials expended in the repair of his driveway."[28]  Following the hearing, the Commission voted to terminate plaintiff's employment with the county.[29]  Plaintiff does not claim that any violation of his rights resulted from this hearing process.

The Jackson County Employee Manual establishes a two-step appeal process for employees who receive adverse employment decisions.  First, the aggrieved employee may appeal to the Jackson County Personnel Board (the "Personnel

---

[25]*Id.* at ¶ 34.

[26]*Id.* at ¶ 35.

[27]*Id.* at ¶ 41.

[28]*Id.* at ¶ 39.

[29]*Id.* at ¶ 42.

Board"), which will hold a hearing on the employee's claims.[30]  Then, "[a]ny person aggrieved by the decision of the [Personnel Board] may appeal such decision to the Circuit Court of Jackson County."[31]

In accordance with these procedures, plaintiff appealed the Commission's decision to the Personnel Board, which held a hearing on March 27, 2003.[32]  At this hearing, plaintiff's supervisors again testified that they had approved the repairs to plaintiff's driveway, and recommended that plaintiff be suspended rather than terminated.[33]  Following the hearing, the Personnel Board found "that the Commission had violated Section VIII of the Personnel Handbook by preempting the responsibility of the County Engineer," and reported its decision to the Commission

---

[30]*See* doc. no. 6 (Defendant's Motion to Dismiss), Exhibit B (Excerpt from Jackson County Employee Manual), at §§ 2(a), 2(d).  The relevant sections of the Jackson County Employee Manual read in full:

> a.    Within ten (10) calendar days of receipt of the appointing authority's decision or non-response; or, within ten (10) calendar days of the effective date of any disciplinary action that involves a demotion, suspension without pay, or dismissal, the employee may elevate his/her grievance to the Jackson County Personnel Board.
>
> . . .
>
> d.    Upon receipt of the employee's appeal, the board will set a hearing date in accordance with the board's hearing procedures

*Id.* at §§ 2(a), 2(d).

[31]*Id.* at § 2(e).

[32]Complaint, at ¶¶ 43, 44.

[33]*Id.* at ¶¶ 45-46.

on April 3, 2003.[34]  Plaintiff did not clarify the effect of the Commission's "violation" of Section VIII, and he did not provide the court with a copy of that section of the Employee Manual.[35]  Nonetheless, the court concludes that the ultimate effect of the Personnel Board's decision was to overturn the termination of plaintiff's employment. Plaintiff does not claim that any violation of his rights resulted from the Personnel Board's hearing and decision.

Soon thereafter, members of the Commission requested the Personnel Board to change its decision that plaintiff should not be terminated, but the Personnel Board refused to do so.[36]  On April 8, 2003, the Commission met again to consider plaintiff's employment status, but neither plaintiff nor his attorney was given notice of the meeting.[37]  At the April 8 meeting, in plaintiff's absence, the Commission considered a written recommendation from plaintiff's supervisor that plaintiff be terminated.[38]  This recommendation was contrary to the supervisor's prior recommendation that plaintiff merely be suspended.  After hearing this evidence, the Commission again voted to terminate plaintiff's employment with the County, and it informed plaintiff of its decision in a letter dated April 9, 2003, upon the

---

[34]*Id.* at ¶¶ 47-48.

[35]Plaintiff uses the terms "Employee Manual" and "Personnel Handbook" interchangeably.

[36]Complaint, at ¶¶ 49-50.

[37]*Id.* at ¶¶ 51-52.

[38]*Id.* at ¶ 54.

recommendation of the County Engineer.[39]  Plaintiff does not explain the significance of obtaining the recommendation of the County Engineer, but the court presumes that the Engineer's recommendation would cure the deficiency found by the Personnel Board in its prior review.  It is the process followed (or, perhaps more accurately stated, the process that *was not followed*) in conjunction with this April 8, 2003, meeting which forms the basis of plaintiff's due process claim.[40]

Plaintiff did not appeal the Commission's April 8, 2003, decision to the Personnel Board.  Instead, he appealed directly to the Circuit Court of Jackson County on August 7, 2003.[41]  He then filed this federal lawsuit on October 22, 2003, on which date the state court suit still was pending.

## III.  DISCUSSION

Plaintiff claims that the Jackson County Commission and its individual members violated his Fourteenth Amendment rights to procedural due process and

---

[39]*Id.* at ¶¶ 56, 58.

[40]*See* doc. no. 10 (Plaintiff's Response to Motion to Dismiss/Motion for Summary Judgment), at unnumbered page 11 ("It is the second hearing held on or about April 9, 2003 that creates the liability of the Defendants in this case.").  In his brief, plaintiff is inconsistent in stating the date of this hearing.  Sometimes, he states the hearing occurred on April *8*; other times, he states the hearing occurred on April *9*.  The court will construe the inconsistencies as a mere oversight or a careless proofreading error.  In plaintiff's verified complaint, on which he relies as evidence, plaintiff states the hearing occurred on April *8*, and that he was informed of the results of the hearing on April *9*.  The court will accept the April 8 date, the accuracy of which was sworn to by plaintiff in his verified complaint, as the true date of the hearing.

[41]Doc. no. 6 (Defendant's Motion to Dismiss), at Exhibit A (Petition for Judicial Review in the Circuit Court of Jackson County, Alabama).

equal protection of the law.  The court will consider each of plaintiff's claims in turn.

## A.    Procedural Due Process

"The Due Process Clause is the source of three types of Section 1983 claims: (1) violations of incorporated provisions of the Bill of Rights; (2) violations of its substantive component; and (3) violations of its procedural component."  *Burch v. Apalachee Community Mental Health Servs., Inc.*, 840 F.2d 797, 800 (11th Cir. 1988) (*en banc*), *aff'd sub nom. Zinermon v. Burch*, 494 U.S. 113 (1990).  Plaintiff's due process claim is of the third variety, for violation of his *procedural* rights.[42]  There are at least four elements of such a claim:  (1) persons acting under color of state law (2) deprived plaintiff (3) of property (4) without due process of law.  *See Parratt v. Taylor,* 451 U.S. 527, 536-37 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327 (1986).  Defendants do not dispute that they were acting under color of state law, or that plaintiff was deprived of a constitutionally-protected property interest in continued employment by county government.  Thus, the only remaining consideration is whether defendants' failure to give plaintiff notice of the meeting that occurred prior to the termination of his employment on April 8, 2003, deprived plaintiff of due process of law.

---

[42]In his brief, plaintiff clarifies that he is not seeking redress for a violation of his *substantive* due process rights.  *See* doc. no. 10 (Response to Motion to Dismiss/Motion for Summary Judgment), at unnumbered page 3.

Defendants assert that plaintiff's due process allegations must be dismissed because adequate post-deprivation remedies were available to him, and he failed to exhaust those remedies.  Defendants' argument is based on the rule announced by the Eleventh Circuit in *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994) (*en banc*), in which the plaintiff filed suit against the Board of County Commissioners of Osceola County, Florida, for terminating his employment as County Building Official.  *Id.* at 1555.  McKinney alleged that the Board had fired him without reason, thereby violating his "constitutional employment rights" and denying him "substantive due process of law."  *Id.*   The Eleventh Circuit, sitting *en banc*, determined that McKinney's claim implicated procedural, not substantive, due process protections. The court then identified the appropriate test for evaluating procedural due process claims:  "[E]ven if McKinney suffered a procedural deprivation at the hands of a biased Board at his termination hearing, he has not suffered a violation of his procedural due process rights *unless and until the State of Florida refuses to make available a means to remedy the deprivation*."  *Id.* at 1563 (emphasis supplied).

Two members of the Eleventh Circuit panel deciding *Horton v. Board of County Commissioners of Flagler County*, 202 F.3d 1297 (11th Cir. 2000), construed the foregoing passage from the *McKinney* opinion as meaning that "the process a state provides is not only that employed by the board, agency, or other governmental entity

whose action is in question, but also includes the remedial process state courts would

provide if asked." *Id*. at 1300.  Stated differently:

> The *McKinney* rule looks to the existence of an opportunity — to whether the state courts, if asked, generally would provide an adequate remedy for the procedural deprivation the federal court plaintiff claims to have suffered.  If state courts would, then there is no federal procedural due process violation regardless of whether the plaintiff has taken advantage of the state remedy or attempted to do so.  If state courts generally would not provide an adequate remedy for that type of procedural deprivation, then the federal court determines whether the Fourteenth Amendment Due Process Clause requires such a remedy, and if it does, the federal court remedies the violation.

*Id*.[43]  It is important to note that the *McKinney* rule does not mandate exhaustion of

available state remedies. In other words, the *McKinney* analysis

> does not turn on whether a plaintiff has presented the claim to the state courts, because the rule is not based on ripeness or exhaustion principles.  *See McKinney,* 20 F.3d at 1564 n.20 ("McKinney's case fails, therefore, not for want of exhaustion; indeed, exhaustion is irrelevant to our decision and finds no mention in the opinion.")

---

[43]The *Horton* court emphasized that the *McKinney* rule would not leave plaintiffs who had been deprived of their property without recourse.

> There is no danger that plaintiffs who have been deprived of property without the procedural protections the Fourteenth Amendment guarantees will be left without a remedy by the proper application of the *McKinney* rule.  The existence of an adequate state law remedy for the claimed deprivation is a prerequisite to the application of the rule.  Only after a federal district court determines that an adequate state remedy does exist — which is another way of saying that state law does not leave the plaintiff with a procedural deprivation that cannot be remedied in state court — will the district court apply the *McKinney* rule to hold that there has been no federal due process violation.

*Horton,* 202 F.3d at 1300.

-12-

*Horton,* 202 F.3d at 1300.  Thus, defendants' argument — that plaintiff cannot succeed on his procedural due process claim because he failed to exhaust all available post-deprivation state remedies — is unavailing.

Instead, the pivotal question is whether the state of Alabama provided a post-deprivation process by which plaintiff could seek review of defendants' alleged procedural violation.  This question must be answered in the affirmative.  First, plaintiff could have appealed the Commission's April 8, 2003, decision to the Personnel Board of Jackson County, as provided by the Jackson County Personnel Handbook.  Plaintiff clearly was aware of his right to appeal to the Personnel Board, because he did appeal the Commission's first decision to terminate him in March of 2003.[44]  The Jackson County Employee Manual also provides that plaintiff may seek post-deprivation review of the Commission's decision through an appeal to the Circuit Court of Jackson County, Alabama.  Plaintiff pursued this avenue of relief by filing suit in state court on August 7, 2003.

Thus, the state of Alabama has provided plaintiff with a post-deprivation remedy to redress defendants' April 8, 2003, decision to terminate his employment.  Nonetheless, plaintiff argues that *McKinney* does not mandate dismissal of his

---

[44]The fact that plaintiff failed to avail himself of this post-deprivation remedy in April of 2003 is immaterial.  *See Cotton v. Jackson,* 216 F.3d 1328, 1331 ("If adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process.").

procedural due process claim.  Plaintiff's argument in this regard has two parts.  First, plaintiff asserts that due process requires a pre-deprivation hearing, regardless of whether post-deprivation remedies also are available.  Because the Commission did not hold any kind of hearing prior to voting a second time to terminate his employment, plaintiff argues, no post-deprivation remedy can be sufficient.

It is true that due process generally "requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542 (1985) (citing *Board of Regents v. Roth,* 408 U.S. 564, 569-570 (1972); *Perry v. Sinderman,* 408 U.S. 593, 599, (1972)).  Even so, plaintiff's interpretation of this general rule would undermine the central premise of the *McKinney* decision.  The *McKinney* rule was intended to ensure a *post-deprivation* remedy for an agency's failure to follow proper procedures.  The *McKinney* court did not limit its decision — that a plaintiff does not state a procedural due process claim if state courts would provide an adequate post-deprivation review — to cases in which a hearing was held prior to the alleged deprivation.  Instead, the court emphasized that "*the state may cure a procedural deprivation by providing a later procedural remedy*; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *McKinney,* 20 F.3d

-14-

at 1557 (emphasis supplied).  Further, the Eleventh Circuit has applied the *McKinney* rule even in situations where the plaintiff did not receive a pre-deprivation hearing. *See, e.g., Cotton,* 216 F.3d at 1331-33 (plaintiff's procedural due process claim was dismissed under *McKinney*, even though he did not receive a pre-deprivation hearing, because the state provided adequate post-deprivation remedies).

This is not to say that post-deprivation remedies will *always* be sufficient to remedy the deprivation of property rights, if no hearing was held prior to the deprivation. In *Lumpkin v. City of Lafayette,* 24 F. Supp. 2d 1259 (M.D. Ala. 1998), the district court clarified when a pre-deprivation hearing would be required pursuant to *Loudermill.*  In that case, Lumpkin's position with the city was terminated, and Lumpkin did not receive either notice or a hearing prior to the termination.  *Id.* at 1260-61.  The district court held that Lumpkin's resulting procedural due process claim failed, because the state provided him with an adequate post-deprivation remedy.  *Id.* at 1266.  The court acknowledged the existence of case law holding that "a plaintiff could state a procedural due process violation under 42 U.S.C. § 1983 without pleading the unavailability or inadequacy of the state's postdeprivation remedies."  *Id.* at 1264 (citing *Fetner v. City of Roanoke,* 813 F.2d 1183 (11th Cir. 1987); *Enterprise Fire Fighters' Assn. v. Watson,* 869 F. Supp. 1532 (M.D. Ala. 1994); *Peacock v. City of Elba,* No. 96-D-755-S, 1997 WL 1068632 (M.D. Ala.

-15-

March 27, 1997)).  The court distinguished those cases, however, by comparing them with the Supreme Court's decisions in *Parratt, supra*, and *Hudson v. Palmer,* 468 U.S. 517 (1983), which held that "'an *unauthorized* intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available.'"  *Lumpkin,* 24 F. Supp. 2d at 1265 (quoting *Hudson,* 468 U.S. at 533) (emphasis supplied).

> In each of these cases [holding that a plaintiff need not plead the inadequacy of the state's postdeprivation remedies], the plaintiffs were not alleging that the mayor and city council members acted in contravention to an established city procedure setting forth what process was due to public employees.  Instead, the plaintiffs were directly challenging procedures which permitted officials to violate an individual's due process rights or the lack of established procedures which gave officials the freedom to violate an individual's due process rights.
>
> . . .
>
> If Mr. Lumpkin had alleged that the mayor and council members acted *pursuant to* the city's procedures, or *in the absence of* any procedures, the violation of his procedural due process rights would have been complete at the moment of his termination, assuming that due process entitled him to notice and a hearing.  That is not what Mr. Lumpkin alleges.  Mr. Lumpkin does not attack the City of Lafayette's established procedure.  He asserts that the mayor and council members *ignored* the city's established procedure when they eliminated his position without notice or a due process hearing.
>
> . . .

Mr. Lumpkin is not alleging that the deprivation of his property interest resulted from an established state procedure.  His Amended Complaint makes clear that he is challenging actions of city officials *which directly contravene the city's established procedure.*  Mr. Lumpkin's claim, that unauthorized actions of city officials deprived him of his property in violation of his due process rights, falls within the rule set forth in *Parratt v. Taylor and Hudson v. Palmer.*  Thus he must demonstrate the absence of a meaningful state post-deprivation remedy to make out a procedural due process violation.

*Lumpkin,* 24 F. Supp. 2d at 1264-65 (emphasis supplied).

Similarly, the plaintiff in this case does not contend that the deprivation of his rights resulted from either an established procedure or the absence of an established procedure.  Instead, he argues that his rights were violated because *the Commission was required to hold a hearing prior to terminating his employment, but it failed to do so.*  His argument is, in essence, that the unauthorized actions of the Commission *contravened* the established procedure of holding a hearing.  Thus, plaintiff must "demonstrate the absence of a meaningful state post-deprivation remedy to make out a procedural due process violation."  *Lumpkin,* 24 F. Supp. 2d at 1264-65; *see McKinney,* 20 F.3d at 1557, 1565.

As set forth above, the State *does provide* a post-deprivation remedy by allowing appeals to both the Personnel Board and the Circuit Court.  Even so, plaintiff asserts that the *McKinney* rule does not bar his procedural due process claim, because the available post-deprivation remedies are inadequate.  *See Cotton*, 216 F.3d

-17-

at 1331 ("[W]e — when determining if a plaintiff has stated a valid procedural due process claim — look to whether the available state procedures were *adequate* to correct the alleged procedural deficiencies.") (emphasis supplied).  As plaintiff states, "[u]nder Alabama law judicial review is under the common law writ of *certiorari*."[45] He asserts that this remedy is inadequate because the standard of review employed by the state court is limited to reviewing the record and determining whether it is supported by substantial evidence.  This court disagrees.

To be considered constitutionally adequate, "the state procedure need not provide all the relief available under section 1983. . . .  Instead, the state procedure must be able to correct whatever deficiencies exist and to provide plaintiff with whatever process is due."  *Cotton,* 216 F.3d at 1331.  On review, an Alabama state court is "responsible for reviewing the record *to ensure that the fundamental rights of the parties, including the right to due process,* [*have*] *not been violated.*"  *Evans v. City of Huntsville*, 580 So. 2d 1323, 1325 (Ala. 1991) (emphasis supplied).  Thus, Alabama courts "review employment termination proceedings both to determine whether they are supported by substantial evidence *and to see that the proceedings*

---

[45]Doc. no. 10 (Plaintiff's Response to Defendant's Motion to Dismiss or for Summary Judgment), at unnumbered page 13.  Indeed, under Alabama state law, "where a statute 'provides no right of appeal or statutory certiorari, the common law writ of certiorari is the *only* available means of review.'" *Fields v. State of Alabama*, 534 So. 2d 615, 616 (Ala. Civ. App. 1987) (quoting *Ex parte Smith*, 394 So. 2d 45, 48 (Ala. Civ. App. 1981)) (emphasis supplied).

*comport with procedural due process*." *Bell v. City of Demopolis,* 86 F.3d 191, 192 (11th Cir. 1996) (citations omitted) (emphasis supplied).  Based on this dual review, the Eleventh Circuit has previously held Alabama's writ of *certiorari* to be an adequate post-deprivation remedy for a procedural deprivation.  *See id. at* 192 ("The state offers an adequate remedy in the form of administrative as well as state court review."); *Cotton,* 216 F.3d at 1331 ("We agree with Defendant that certiorari is generally an adequate state remedy.").  Accordingly,  plaintiff cannot escape the *McKinney* rule on this basis.

In summary, the State of Alabama offers plaintiff an adequate post-deprivation remedy to correct the Commission's earlier procedural violation.  Thus, pursuant to *McKinney,* plaintiff's procedural due process claim cannot succeed.

## B.    Equal Protection

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."[46]  Plaintiff's claim under this provision

---

[46] In full text, the first section of the amendment provides that:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof,  are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

is that

> Defendants' actions in terminating [him] were irrational and
> wholly arbitrary and based upon malignant animosity towards [him] in
> violation of the equal protection clause of the Fourteenth Amendment
> to the United States Constitution under [*Village of*] *Willowbrook v.
> Olech,* 528 U.S. 562 (2000). . . . As described above, Plaintiff was
> treated by the Defendants intentionally differently from others similarly
> situated and there was no rational basis for the difference in treatment.[47]

Defendants argue that the claim must be dismissed because plaintiff has not alleged

any differential treatment *on the basis of race or sex.* As plaintiff points out,

however, his rights under the Equal Protection Clause cannot be cabined so narrowly.

The Equal Protection Clause does not exist solely to protect against race- or sex-

based discrimination. Instead, plaintiff can proceed, as he has done here, by asserting

his membership in a "class of one," a concept first recognized by the Supreme Court

in *Olech.* There,

> Grace Olech and her late husband Thaddeus asked petitioner Village of
> Willowbrook (Village) to connect their property to the municipal water
> supply. The Village at first conditioned the connection on the Olechs
> granting the Village a 33-foot easement. The Olechs objected, claiming
> that the Village only required a 15-foot easement from other property
> owners seeking access to the water supply. After a 3-month delay, the
> Village relented and agreed to provide water service with only a 15-foot
> easement.
>
> Olech sued the Village, claiming that the Village's demand of an

---

U.S. Const., amend. XIV, § 1 (1868).

[47]Complaint, at ¶ 72.

additional 18-foot easement violated the Equal Protection Clause of the Fourteenth Amendment.  Olech asserted that the 33-foot easement demand was "irrational and wholly arbitrary"; that the Village's demand was actually motivated by ill will resulting from the Olechs' previous filing of an unrelated, successful lawsuit against the Village; and that the Village acted either with the intent to deprive Olech of her rights or in reckless disregard of her rights.

*Olech,* 528 U.S. at 563.  The Supreme Court held that Olech's complaint stated an

Equal Protection claim.

Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  *See Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 43 S. Ct. 190, 67 L. Ed. 340 (1923); *Allegheny Pitttsburgh Coal Co. v. Commission of Webster Cty.,* 488 U.S. 336, 109 S. Ct. 633, 102 L. Ed. 2d 688 (1989).  In so doing, we have explained that "'[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Sioux City Bridge Co., supra,* at 445, 43 S. Ct. 190 (quoting *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 352, 38 S. Ct. 495, 62 L. Ed. 1154 (1918)).

That reasoning is applicable to this case.  Olech's complaint can be fairly be construed as alleging that the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners.  *See Conley v. Gibson,* 355 U.S. 41, 45-56, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).  The complaint also alleged that the Village's demand was "irrational and wholly arbitrary" and that the Village ultimately connected her property after receiving a clearly adequate 15-foot easement.  These allegations, quite apart from the Village's subjective motivation, are sufficient to

state a claim for relief under traditional equal protection analysis.

*Olech,* 528 U.S. at 564-65 (bracketed alterations in original).

The Eleventh Circuit has not substantially addressed the *Olech* decision.[48] Other courts addressing the scope of the decision have cautioned against extending it too broadly, however, lest the federal courts be overrun with Equal Protection lawsuits arising from everyday, common-garden variety, governmental decisions.  In *Jennings v. City of Stillwater,* 383 F.3d 1199 (10th Cir. 2004), for example, the Tenth Circuit faced a "class of one" challenge to the adequacy of a police investigation of a rape.  The Court grappled with defining the scope of the *Olech* decision.

> In the wake of *Olech*, the lower courts have struggled to define the contours of class-of-one cases.  All have recognized that, unless carefully circumscribed, the concept of a class-of-one equal protection

---

[48]Indeed, this court found only one case in which the Eleventh Circuit even cited *Olech*.  In *Williams v. Pryor,* 240 F.3d 944 (11th Cir. 2001), the Eleventh Circuit addressed a constitutional challenge to a state statute prohibiting the commercial distribution of any device primarily used for the stimulation of human genitals.  In evaluating whether the statute passed rational basis review, the Court stated:

> The Supreme Court recently reaffirmed that the Equal Protection Clause is violated (in cases in which heightened scrutiny does not apply) when the plaintiff — whether a class, group, or simply one individual — proves "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S. Ct. 1073, 1074, 145 L. Ed. 2d 1060 (2000) (holding that plaintiff stated constitutional Equal Protection Clause cause of action by alleging that village acted irrationally, wholly arbitrarily, and out of malice toward plaintiff when it demanded 33-foot easement from plaintiff, contrary to 15-foot easements obtained from others similarly situated).

*Id.* at 951.  The Eleventh Circuit's analysis of *Olech* did not extend beyond this citation.

-22-

claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

To make matters worse, a certain degree of randomness and irrationality necessarily "abounds at the bottom rung of law enforcement," *Bell v. Duperrault,* 367 F.3d 703, 712 (7th Cir. 2004) (Posner, J., concurring), and in other areas of state and local decisionmaking, as well. A police officer may allow a car traveling 20 m.p.h. over the speed limit to fly right by, while stopping to ticket a car traveling only 15 m.p.h. above the limit. A public university may admit one applicant and deny another with seemingly identical credentials. The IRS may audit one taxpayer and not another with an identical, or more suspicious, profile. An insistence that all government officials be able to provide articulable reasonable grounds for every difference in treatment would open almost every low-level decision to attack, and play havoc with the daily operation of government.

*Jennings,* 383 F.3d at 1210-11 (footnoted omitted).[49]

---

[49]In the omitted footnote, the Tenth Circuit identified several commentators who have highlighted the confusion surrounding the scope of "class of one" claims. *Jennings,* 383 F.3d at 1211 n.4. This confusion also includes a difference in opinion as to whether a showing of malice or ill will is required. The majority opinion in *Olech* did not reach "the alternative theory of 'subjective ill will' relied on by" the Court of Appeals. *Olech,* 528 U.S. at 565. In his concurrence, Justice Breyer addressed concerns over turning ordinary zoning disputes into constitutional claims by emphasizing the importance of considering the governmental official's subjective motivation. *Id.* He stated:

Considering similar policy concerns, the district court in *Campagna v. Commonwealth of Massachusetts Dept. of Environmental Protection,* 206 F. Supp. 2d 120 (D. Mass. 2002), questioned the applicability of *Olech* in the context of employment disputes.

> While [the *Olech* rule] may have some viability in certain contexts, if supported by adequate allegations, the applicability of the "class of one" theory to an employment-based equal protection claim seems dubious.  *Olech* itself was a discriminatory zoning case, and Justice Breyer in his separate concurrence expressed concern about transforming "run-of-the-mill zoning cases into cases of constitutional

---

> This case, however, does not directly raise the question whether the simple and common instance of a faulty zoning decision would violate the Equal Protection Clause.  That is because the Court of Appeals found that in this case respondent had alleged an extra factor as well – a factor that the Court of Appeals called "vindictive action," "illegitimate animus," or "ill will."  160 F.3d 386, 388 (C.A.7 1998).  And, in that respect, the court said this case resembled *Esmail v. Macrane,* 53 F.3d 176 (C.A. 7 1995), because the *Esmail* plaintiff had alleged the municipality's differential treatment "was the result not of prosecutorial discretion honestly (even if ineptly – even if arbitrarily) exercised but of an illegitimate desire to 'get' him."  160 F.3d at 388.
>
> In my view, the presence of that added factor in this case is sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right.  For this reason, along with the others mentioned by the Court, I concur in the result.

*Olech,* 528 U.S. at 565-66.

The Courts of Appeals construing *Olech* are split on whether the "added factor" of malice or ill will is required.  *See Jennings,* 383 F.3d at 1211.  The Eleventh Circuit, although less than clear on the point, has suggested that it would require a showing of malice.  *See Williams,* 240 F.3d at 951 (describing *Olech* as "holding that plaintiff stated constitutional Equal Protection Clause cause of action by alleging that village acted irrationally, wholly arbitrarily, *and out of malice* toward plaintiff when it demanded 33-foot easement from plaintiff, contrary to 15-foot easements obtained from others similarly situated") (emphasis supplied).  This court need not decide which viewpoint to espouse, however, because plaintiff has not demonstrated that he was intentionally treated differently from others similarly situated.

right." [*Olech,*] 528 U.S. at 566, 120 S. Ct. 1073.  In this case, if plaintiff is correct on the law, any public employee convinced that someone similarly situated is being treated more favorably could sue his or her employer under the Fourteenth Amendment for a violation of equal protection. Since practically every employee, public or private, is bound to be convinced at some point that he or she is getting the short end of the stick, it is not hard to imagine the bee hive of constitutional litigation that would be generated by this variant of the "class of one" doctrine. It seems unlikely that the Supreme Court intended such a dramatic result in its *per curiam* opinion in *Olech.*

*Id.* at 126-27.

This court also is concerned about stretching the limits of the *Olech* doctrine too far.  The decision whether to apply *Olech* to an employment-based Equal Protection claim requires a careful balance between the court's duty to follow Supreme Court precedent and avoiding a construction of the case which would cause the federal courts to be overrun with countless lawsuits by individuals who feel they have been "slighted" by a governmental entity.  Ultimately, however, this court finds it unnecessary "to grapple with this cumbersome doctrinal issue," *Campagna,* 206 F. Supp. 2d at 127, because plaintiff has failed to establish that he was "intentionally treated differently from others similarly situated and that there was no rational basis for the difference in treatment." *Olech,* 528 U.S. at 564.

The burden of identifying similarly situated individuals is a heavy one.  *See McDonald v. Village of Winnetka,* 371 F.3d 992, 1002-03 (7th Cir. 2004) ("It is clear

that similarly situated individuals must be very similar indeed.").  In the employment context, the Eleventh Circuit requires that "similarly situated" individuals be similar "in all relevant respects."  *Knight v. Baptist Hospital of Miami, Inc.,* 330 F.3d 1313, 1316 (11th Cir. 2003).  The determination is fact-specific, and the goal is to make realistic, accurate comparisons.  "Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples."  *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 19 (1st Cir. 1989), *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez,* 367 F.3d 61 (1st Cir. 2004).

Plaintiff asserts vaguely that "Defendants' actions in terminating" him led to an Equal Protection violation under *Olech.*  It is unclear from plaintiff's verified complaint and other submissions whether he is referring to defendants' "actions" in failing to hold a hearing prior to his termination in April of 2003, or simply defendants' "actions" in terminating him in general, without regard to whether a hearing was held.

If plaintiff is relying on defendants' failure to hold a hearing, his claim clearly fails.  Plaintiff has offered *no* proof, or even a suggestion, of another individual who was similarly situated but who was treated more favorably.  In other words, plaintiff has offered no proof of a county employee who faced disciplinary charges due to his

use of county materials to repair his driveway, and who *did* receive full hearings before the Commission prior to being terminated.  Indeed, plaintiff has not identified an employee who received full hearings prior to being terminated for *any* reason.

Even if plaintiff is referring to his termination in general, his claim also fails. In his verified complaint, plaintiff makes much of the fact that other individuals had their driveways repaired by the Public Works Department beyond the county's right of way.  He also points out that some employees of the Public Works Department had their driveways repaired by the Department even though they lived within the limits of a municipality, a practice which is contrary to the Department's rules.

These allegations do not establish that plaintiff is "similarly situated" to another individual who was intentionally and arbitrarily treated more favorably than he was.  Other individuals whose driveways were repaired beyond the county's right of way are not "similarly situated" to plaintiff if they are not also employees of the Public Works Department.  Plaintiff has not identified another *county employee* who enjoyed such unauthorized repairs, but who was not disciplined as a result.  Further, the fact that Public Works Department employees who live within the limits of a municipality have had their driveways repaired also is immaterial.  As plaintiff points out, he does not live within the limits of a municipality. Further, he was not disciplined for having his driveway repaired within the limits of a municipality; he

was disciplined for using county materials to repair his driveway beyond the right of way.   Therefore, employees who have had driveway repairs within the limits of a municipality are not "similarly situated" to plaintiff.   An individual "similarly situated" to plaintiff would be a Public Works Department employee who used county materials *without permission*[50] to make repairs to his driveway outside the county's right of way.   Plaintiff has pointed to no such similarly situated individual who received differential treatment, and therefore his *Olech*-based Equal Protection claim must fail.

## IV.  CONCLUSION

In accordance with the foregoing, defendants' motion for summary judgment is due to be granted.  All claims of plaintiff will be dismissed with prejudice.[51]   An appropriate order will be entered contemporaneously herewith.

DONE this 23rd day of June, 2005.

_____
United States District Judge

---

[50]Plaintiff neglects to emphasize that he was disciplined only after making repairs to his driveway *without first seeking his supervisor's permission*.

[51]As all of plaintiff's substantive claims are being dismissed on the merits, the court need not address the qualified immunity defense raised by defendants. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) (stating that a court faced with a qualified immunity defense should first evaluate whether the facts establish a constitutional violation, and then consider whether the right violated, if any, was clearly established).